UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

COASTAL CONSERVATION ASSOCIATION,

        Plaintiff,

vs.                                    Case No.  2:05-cv-400-FtM-29DNF

CARLOS GUTIERREZ, in his official
capacity as  Secretary of the United
States Department of Commerce, THE
NATIONAL OCEANIC AND ATMOSPHERIC
ADMINISTRATION, THE NATIONAL MARINE
FISHERIES SERVICE,

        Defendants.

_____

THE FISHING RIGHTS ALLIANCE, INC.,

        Plaintiff,

vs.                                    Case No.  2:05-cv-419-FtM-29DNF

CARLOS GUTIERREZ, in his official
capacity as  Secretary of the United
States Department of Commerce, THE
NATIONAL OCEANIC AND ATMOSPHERIC
ADMINISTRATION,  and the  NATIONAL
MARINE FISHERIES SERVICE,

        Defendants.

_____

**OPINION AND ORDER**

The Gulf of Mexico is home to a variety of ecologically and commercially important fish species, including groupers, snappers, tilefishes, jacks, sea basses, porgies, wrasses, triggerfishes, and grunts.  50 C.F.R. Part 622, Appendix A, Table 3.  Both

recreational and commercial anglers fish for grouper within the grouper fishery in the Gulf of Mexico.   The grouper complex includes seventeen species of groupers, including, goliath, dwarf sand perch, sand perch, misty, snowy, yellow edge, nasa, Warsaw, speckled hind, black, gag, red, yellow-fin, scamp, yellow mouth, rock hind, and red hind groupers.   50 C.F.R. Part 622, Appendix A, Table 3.   Red grouper is primarily fished off the west coast of Florida from Panama City, Florida to the Florida Keys, with a heavy concentration in the Tampa, Florida area southward. (Administrative Record ("AR") 277).

On July 25, 2005, the Secretary of the United States Department of Commerce (the Secretary), in conjunction with the National Oceanic and Atmospheric Administration (NOAA) and the National Marine Fisheries Service (NMFS)(collectively defendants), published an interim Rule to Reduce the Recreational Harvest of Gulf of Mexico Red Grouper, Rule No. 62605 (the Interim Rule).   The Interim Rule reduced the red grouper bag limit from two fish per person to one fish per person, reduced to aggregate grouper bag limit from five fish per person to three fish, and closed recreational fishing for all grouper species in the Gulf of Mexico Exclusive Economic Zone ("Gulf of Mexico EEZ") for November and December, 2005.   Meetings of the Gulf Council concerning a final draft Red Grouper Regulatory Amendment for the recreational sector are currently scheduled for November, 2005.   Gulf of Mexico Fishery

Management Council; Public Meetings, 70 Fed. Reg. 62,098-01 (Oct. 28, 2005).

In these consolidated civil actions, plaintiffs seek declaratory and injunctive relief pursuant to the Magnuson-Stevens Fishery Conservation and Management Act, as amended in 1996 by the Sustainable Fisheries Act, 16 U.S.C. § 1801 *et seq.* ("Magnuson-Stevens Act"), the National Environmental Policy Act, 42 U.S.C. § 4321 *et seq.* ("NEPA"), and the Administrative Procedures Act, 5 U.S.C. §§ 701-706 ("APA") to preclude the lower aggregate grouper bag limit and the two month closure.  All parties filed cross motions for summary judgment (Docs. #31-36), and the Court heard oral argument on October 27, 2005.

### I.

In 1976 Congress found, *inter alia*, that fish off the coasts of the United States were a valuable and renewable natural resource, but that certain stocks of fish had declined or could decline to the point where their survival was threatened.  16 U.S.C. § 1801(a)(1), (2).  Congress also found that commercial and recreational fishing constituted a major source of employment which contributed significantly to the national economy, and that fishery resources were finite but renewable.  16 U.S.C. § 1801(a)(3), (5).  Further, Congress found that a national program for the conservation and management of fishery resources was necessary to prevent overfishing, to rebuild overfished stocks, to insure

conservation, to facilitate long-term protection of essential fish habitats, and to realize the full potential of the country's fishery resources.  16 U.S.C. § 1801(a)(6).

Based on these findings, Congress enacted the Magnuson-Stevens Act (the Act).[1]  The purposes of the Act included to "conserve and manage the fishery resources found off the coasts of the United States," 16 U.S.C. § 1801(b)(1); to promote domestic commercial and recreational fishing under sound conservation and management principles, 16 U.S.C. § 1801(b)(3); to provide for the preparation and implementation of fishery management plans, in accordance with national standards, which would achieve and maintain, on a continuing basis, the optimum yield for each fishery, 16 U.S.C. § 1801(b)(4); and to establish Regional Fishery Management Councils to be stewards of fishery resources through the preparation, monitoring, and revision of fishery management plans (FMP), 16 U.S.C. § 1801(b)(5).  The Act as amended created eight Regional Fishery Management Councils.  16 U.S.C. § 1852(a).  The Councils develop fishery management plans and plan amendments for each fishery requiring conservation and management; conduct public hearings concerning the development of fishery management plans and amendments and the administration and implementation of the Act;

---

[1]In 1996 the Magnuson-Stevens Act was amended by the Sustainable Fisheries Act, which added new requirements to the Act to accelerate the rebuilding of overfished species.  <u>Natural Res. Def. Council, Inc. v. National Marine Fisheries Serv.</u>, 421 F.3d 872, 875 (9th Cir. 2005).

submit proposed plans and amendments to the Secretary, 16 U.S.C. § 1852(h); and submit proposed regulations to the Secretary. 16 U.S.C. § 1853(c).

The relevant Council in this case is the Gulf of Mexico Fishery Management Council (the Gulf Council). The Gulf Council manages fishery resources off the coasts of Texas, Louisiana, Mississippi, Alabama and Florida. 16 U.S.C. § 1852(a)(1)(E). See Delta Commercial Fisheries Ass'n v. Gulf of Mexico Fishery Mgmt. Council, 364 F.3d 269, 271 (5th Cir. 2004) for a further description of the Gulf Council. The Gulf Council's jurisdiction to manage fishery resources in the Gulf of Mexico extends from the outer limits of the state territorial waters (about nine miles) to 200 nautical miles seaward. (AR 1165); Southeastern Fisheries Ass'n, Inc. v. Chiles, 979 F.2d 1504, 1507 (11th Cir. 1992); Bateman v. Gardner, 716 F. Supp. 595, 596 (S.D. Fla. 1989).

The fishery management plans or amendments must be consistent with ten national standards promulgated by the Magnuson-Stevens Act, 16 U.S.C. § 1851(a)[2], must satisfy fourteen other specific

---

[2]As relevant to this case, 16 U.S.C. § 1851(a) provides:

Any fishery management plan prepared, and any regulation promulgated to implement any such plan, pursuant to this subchapter shall be consistent with the following national standards for fishery conservation and management:

**(1)** Conservation and management measures shall prevent overfishing while achieving, on a continuing basis, the optimum yield from each fishery for the United States
(continued...)

criteria, 16 U.S.C. § 1853(a)(1)-(14), and may address twelve other components, 16 U.S.C. § 1853(b)(1)-(12).   The Secretary reviews each proposed plan or amendment, and either approves, disapproves, or partially approves it after complying with certain procedural requirements.   16 U.S.C. § 1854(a).   If approved, the Secretary promulgates regulations to implement the plan or amendment, which have the force and effect of law.   16 U.S.C. §§ 1854(b)(3) and 1855(d).   The Secretary is also given authority to prepare fishery management plans or amendments under certain circumstances. 16 U.S.C. § 1854(c).

The Act further vested the Secretary with the authority to ask Councils to take action and to develop and implement rebuilding plans for overfished fish species.   16 U.S.C. § 1854(e). Additionally, the Act conferred authority on the Secretary to

---

[2](...continued)
fishing industry.

**(2)**   Conservation and management measures shall be based upon the best scientific information available.

**(3)** To the extent practicable, an individual stock of fish shall be managed as a unit throughout its range, and interrelated stocks of fish shall be managed as a unit or in close coordination.

. . .

**(9)** Conservation and management measures shall, to the extent practicable, (A) minimize bycatch and (B) to the extent bycatch cannot be avoided, minimize the mortality of such bycatch.

promulgate short-term emergency rules and interim measures needed to reduce overfishing. "If the Secretary finds that an emergency exists or that interim measures are needed to reduce overfishing for any fishery, he may promulgate emergency regulations or interim measures necessary to address the emergency or overfishing without regard to whether a fishery management plan exists for such fishery." 16 U.S.C. § 1855(c)(1). These are intended to be relatively short-term, stop-gap measures. 16 U.S.C. § 1855(c)(3)(B).

**II.**

In June 1983, the Secretary approved the Gulf of Mexico Fishery Management Plan for Reef Fish Resources ("Reef Fish FMP") submitted by the Gulf Council for management of the grouper complex (and others) in the Gulf of Mexico, and the plan was implemented in November, 1984. (AR 321). The primary objectives of the Reef Fish FMP were to rebuild overfished reef fish stocks to stable population levels and to manage access to the reef fish fishery. A major revision of the Reef Fish FMP was implemented in 1990 (id.), and the NMFS implemented the Reef Fish FMP through a series of amendments and regulations providing for such things as the imposition of limitations on fishing equipment, data reporting requirements, quotas and bag limits, seasonal and size limitations, and a permitting system. See 50 C.F.R. Part 622; (AR 321-26).

Stock assessments[3] for the red grouper were conducted in 1991, 1993, and 1999.  (AR 278, 336).  In October, 2000, the NMFS determined that the red grouper stock was overfished and undergoing overfishing.  This finding was based primarily on the results of the 1999 stock assessment, which assessed the red grouper stock as of 1997.  (AR 320, 330, 681, 683).  Under the Act, the Gulf Council had one year to submit a plan to the NMFS to end overfishing and rebuild the red grouper stock.  16 U.S.C. § 1854(c); (AR 320, 330-31).  For various reasons the Gulf Council missed the October, 2001 deadline, and on September 27, 2002, the Secretary submitted a proposed Secretarial Amendment 1 to the Reef Fish Fishery Management Plan (AR 320).

A subsequent 2002 assessment (AR 272-307) found that while red grouper were overfished in 1997, the red grouper stock was in an improved condition by 2001 and was no longer considered overfished. (AR 320).  However, red grouper was not yet at the biomass level

---

[3]A "stock of fish" is "a species, subspecies, geographical grouping, or other category of fish capable of management as a unit."  16 U.S.C. § 1802(37).  A "stock assessment" is "the process of collecting and analyzing biological and statistical information to determine the changes in the abundance of fishery stocks in response to fishing, and, to the extent possible, to predict future trends of stock abundance.  Stock assessments are based on resource surveys; knowledge of the habitat requirements, life history, and behavior of the species; the use of environmental indices to determine impacts on stocks; and catch statistics.  Stock assessments are used as a basis to 'assess and specify the present and probable future condition of a fishery' (as is required by the Magnuson-Stevens Act), and are summarized in the Stock Assessment and Fishery Evaluation of similar document."  50 C.F.R. § 600.10.

capable of producing maximum sustainable yield (MSY) on a continuing basis ($B_{MSY}$).  (AR 320, 330).

On May 8, 2004, a revised Secretarial Amendment 1 was promulgated (AR 308-680).  After summarizing the 2002 assessment that red grouper was no longer overfished but was not at a sufficient biomass level, it stated "measures to reduce overfishing and a rebuilding plan are still needed to restore the stock to the ($B_{MSY}$) level in 10 years or less."  (AR 330).  A secondary purpose of Secretarial Amendment 1 was "to evaluate and control the impact of the red grouper rebuilding plan on other species," specifically gag grouper, deep-water grouper, and tilefish.  (AR 330).  NMFS adopted the revised Secretarial Amendment 1 on May 28, 2004.  (AR 690).

On June 15, 2004, the NMFS published its final rule to implement Secretarial Amendment 1 to the Reef Fish FMP .  (AR 689-96).  The Secretarial Amendment 1, effective July 15, 2004 (AR 690, 1523), imposed bag limits for recreational anglers (two per day for red grouper and five aggregate grouper per day per angler), set a total allowable catch ("TAC") of 6.56 million pounds gutted weight, allocated 5.31 million pounds to the commercial sector, and established a ten year rebuilding plan for red grouper.  (AR 314, 1632).  The remaining 1.25 million pounds gutted weight of the TAC was allocated to the recreational sector.  (AR 314, 769, 1165, 1523, 1540).  Since Secretarial Amendment 1 was specific to red grouper, anglers still had flexibility to fish for other grouper and reef fish species.  (AR 317).

-9-

During its March 9-10, 2005, meeting, the Gulf Council reviewed red grouper landings and concluded that, without additional regulations, recreational red grouper landings in 2005 were likely to exceed the recreational target level, as they had in 2003 and 2004. (AR 895-902, 1523, 1632). Recreational red grouper landings for 2003 were slightly over target, but landings for 2004 were over the target level by almost 2.5 times. (AR 1447, 1523, 1540). As a result, the Gulf Council passed a motion giving the NMFS the authority through emergency or interim rule to bring the recreational red grouper fishing within their target catch levels in Secretarial Amendment 1 for the year 2005. (AR 902-906, 1632).

After additional research was conducted and collected (AR 1447-1522), NOAA requested approval of an interim rule. (AR 1523-1631). The stated purpose of the Interim Rule was to "reduce the likelihood that overfishing for red grouper will occur in 2005." (AR 1537, 1541). NOAA also noted that failure to seek such an interim rule to reduce the 2005 recreational red grouper harvest to target catch levels would likely result in litigation from the commercial sector, which had stayed within its red grouper harvest target catch levels. (AR 1524).

On July 25, 2005, NMFS published the Interim Rule in the Federal Register. (AR 1632-34). The Interim Rule reduced the red grouper bag limit from two fish per person per day to one fish per person per day, reduced to aggregate grouper bag limit from five fish per person to three fish, and closed recreational fishing for

-10-

all grouper species in Gulf of Mexico for November and December, 2005.

On August 17, 2005, plaintiff Coastal Conservation Association filed its four-count Complaint seeking declaratory and injunctive relief as to the aggregate bag limits and the closure (but not the red grouper bag limits). On August 24, 2005, plaintiff Fishing Rights Alliance filed its Complaint seeking similar relief. The Court has consolidated the two cases upon plaintiffs' request. (Doc. #25).[4]

## III.

All parties agree on the standard of review to be utilized by the Court. (Docs. #32, pp. 5-6; #35, pp. 35; #37, pp. 6-7). The Magnuson-Stevens Act adopts portions of the standard of review set forth in the Administrative Procedures Act. 16 U.S.C. § 1855(f)(1)(B),(2). The Court's review is limited to the administrative record[5], and in this case the applicable review standard is whether the agency action is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A); Midwater Trawlers Coop. v. Department of Commerce, 393 F.3d 994, 1002 (9th Cir. 2004). Under the arbitrary

---

[4]Despite the title of the Complaints, it appears that plaintiffs request is only for declaratory relief. The operative pleadings lack any allegations seeking injunctive relief. Without any further details than the title for injunctive relief, the Court can only address the claims in which declaratory relief is sought.

[5]Pursuant to 16 U.S.C. § 1855(f)(3)(B), the Secretary has filed a five volume administrative record. (Doc. #29).

and capricious standard, the reviewing court "gives deference to the agency decision by reviewing for clear error, and by refraining from substituting its own judgment for that of the agency. However, the court must also look beyond the scope of the decision itself to the relevant factors that the agency considered." <u>Sierra Club v. United States Army Corps. of Eng'rs</u>, 295 F.3d 1209, 1216 (11th Cir. 2002)(citations omitted).  A regulation will be found arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." <u>Southern Offshore Fishing Ass'n v. Daley</u>, 995 F. Supp. 1411, 1425 (M.D. Fla. 1998)(quoting <u>Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto Ins.</u>, 463 U.S. 29, 43 (1983)).

**IV.**

**A.  Count One: Finding of Red Grouper Overfishing**

In Count One of the Complaints, plaintiffs seek a declaratory judgment that defendants violated the Magnuson-Stevens Act and the Administrative Procedures Act by adopting the Interim Rule without a finding of either an emergency or of overfishing of red grouper in the Gulf of Mexico EEZ.  Without an emergency or a finding of overfishing, plaintiffs assert that the Secretary had no authority

to promulgate the Interim Rule.  At oral argument, counsel for the defendants agreed that there was no emergency situation involved with the Interim Rule, and that defendants were not relying upon that portion of the statute.

Overfishing is a primary concern of the Magnuson-Stevens Act. Thus, the Act requires the Secretary to report annually to Congress and to the affected Councils on the status of fisheries that are overfished or are approaching a condition of being overfished.  16 U.S.C. § 1854(e)(1).  For fisheries managed under a fishery management plan, the status shall be determined using the criteria for overfishing specified in the plan.  16 U.S.C. § 1854(e)(1).  A fishery "shall be classified as approaching a condition of being overfished if, based on trends in fishing effort, fishery resource size, and other appropriate factors, the Secretary estimates that the fishery will become overfished within two years."  16 U.S.C. § 1854(e)(1).  Thus, the reporting requirement exists for fishieries that are overfished or are estimated by the Secretary to become overfished within two years.

In addition to reporting, action by the Secretary is required if the Secretary determines that a fishery is overfished.  If the Secretary determines that a fishery is overfished, the Secretary "shall" immediately notify the Council and request that action be taken by the Council to end overfishing and to implement conservation and management measures to rebuild affected stocks of fish.  16 U.S.C. § 1854(e)(2).  The Council's plan, amendment, or

proposed regulations to end overfishing must comply with certain requirements.  16 U.S.C. § 1854(e)(4).  If, as in this case, the Council fails to act in a timely fashion, the Secretary is required to prepare a plan, amendment, or regulation to end overfishing.  16 U.S.C. § 1854(e)(5).

During the development of a plan, amendment or proposed regulation to end overfishing, the Council may request the Secretary to implement interim measures to reduce overfishing, pursuant to 16 U.S.C. § 1855(c), until such interim measures can be replaced by the plan, amendment, or regulation.  16 U.S.C. § 1854(e)(6).  Under § 1855(c), in a non-emergency situation, "[i]f the Secretary finds that . . . interim measures are needed to reduce overfishing for any fishery, he may promulgate . . . interim measures necessary to address the . . . overfishing without regard to whether a fishery management plan exists for such fishery."  16 U.S.C. § 1855(c)(1).[6]  These interim measures, "if otherwise in compliance with the provisions of this chapter, may be implemented even though they are not sufficient by themselves to stop overfishing of a fishery."  16 U.S.C. § 1854(e)(6).

---

[6]Defendants' Memorandum discussing Count One begins with an incorrect quotation of the statute.  The Memorandum states: "The Magnuson-Stevens Act explicitly confers authority to implement such interim measures where 'the Secretary finds that an emergency or overfishing exists or that interim measures are needed to reduce overfishing for any fishery.' 16 U.S.C. § 1855(c)(1)."  (Doc. #32, p. 8).  The statute actually states: "If the Secretary finds that an emergency exists or that interim measures are needed to reduce overfishing for any fishery, he may promulgate . . ."  16 U.S.C. § 1855(c)(1).

It is clear from this statutory scheme that there must be a determination of overfishing by the Secretary before an interim measure may be promulgated.  The Magnuson-Stevens Act defines the terms "overfishing" and "overfished" to mean "a rate or level of fishing mortality that jeopardizes the capacity of a fishery[7] to produce the maximum sustainable yield[8] on a continuing basis."  16 U.S.C. 1802(29).

Plaintiffs argue that no such determination of overfishing of red grouper was ever made by the Secretary with respect to the Interim Rule.  (Docs. #36, p. 16, #39, pp. 5-8).  Defendants' Memorandum responds that in October, 2000, the NMFS determined that red grouper were overfished and undergoing overfishing [as of 1997], but fails to mention the 2002 assessment which found red grouper were not overfished.  (Doc. #32, pp. 8-11).  Defendants point to a single paragraph in Secretarial Amendment 1 (AR 345) discussing the specific value of Maximum Fishing Mortality Threshold (MFMT). (Doc. #32, pp. 9). The relevant sentence states: "When the fishing mortality rate exceeds MFMT, a stock is considered to be undergoing overfishing."  (AR 345).  Defendants

---

[7]A "fishery" means "(A) one or more stocks of fish which can be treated as a unit for purposes of conservation and management and which are identified on the basis of geographical, scientific, technical, recreational, and economic characteristics; and (B) any fishing for such stocks."  16 U.S.C. § 1802(13).

[8]"Maximum sustainable yield" ("MSY") is "the largest long-term average catch or yield that can be taken from a stock or stock complex under prevailing ecological and environmental conditions." 50 C.F.R. § 600.310(c)(1).

then argue that "[t]he most recent catch data indicates that overfishing continues in the red grouper recreational fishery," and therefore the Interim Rule was authorized.  (Doc. #32, pp. 9-10).

The Court disagrees with defendants' approach to Count One. The claim is that the Secretary did not make a finding of overfishing in connection with the Interim Rule.  Either he did or he did not.  The fact that such a finding could have been made is insufficient if the Secretary in fact did not make the finding when he implemented the Interim Rule.

The Administrative Record, however, establishes that the Secretary made the required finding of overfishing.  The Federal Register publication of the Interim Rule summarized the background of the matter, including the 2002 stock assessment which found that the red grouper stock was no longer overfished, but had not yet reached a biomass level that was capable of producing maximum sustainable yield on a continuing basis.  (AR. 1632).  The publication continued that the Gulf Council had concluded that a reduction in recreational red grouper landings "is needed to end overfishing in 2005."  (AR 1632).  Additionally, the publication stated: "The purpose of this temporary rule is to reduce the likelihood of overfishing red grouper, while minimizing biological impacts on gag and other groupers that could result from shifts in effort due to red grouper management actions."  (AR 1632).  While a "likelihood" of overfishing may not be sufficient, the publication then stated: "NMFS finds that this temporary rule is

-16-

necessary to reduce overfishing of red grouper in the Gulf of Mexico" and "The Assistant Administrator for Fisheries, NOAA (AA), has determined that this temporary rule is necessary to reduce overfishing of red grouper in the Gulf of Mexico and is consistent with the Magnuson-Stevens Act and other applicable laws." (AR 1633). The Court concludes that this is a sufficient finding for the Secretary to implement interim measures pursuant to 16 U.S.C. § 1855(c). Judgment will therefore be entered in favor of defendants as to Count One.

**B.  Count Two: Interim Rule Overbroad**

In Count Two of the Complaints, plaintiffs seek a declaratory judgment that defendants violated the Magnuson-Stevens Act and the Administrative Procedures Act by adopting an overbroad Interim Rule which does not conform with 16 U.S.C. § 1855(c). Count Two asserts that there was no determination that sixteen of the seventeen species of grouper are overfished, yet the Interim Rule prohibits fishing within the entire grouper fishery for two months and limits the aggregate bag limit for grouper. Count Two contends that the Interim rule is therefore arbitrary, capricious, contrary to law, and an abuse of agency discretion.

The Interim Rule was intended to reduce overfishing of red grouper in the Gulf of Mexico and to minimize the potential adverse impacts on other grouper stocks that could result from a shift in fishing effort from red grouper to other grouper species. (AR 1633-34). The Secretary made the finding of overfishing of red

-17-

grouper, as discussed above.  The Administrative Record, however, clearly establishes that the entire grouper fishery was never determined to be overfished or undergoing overfishing.  Indeed, the record establishes the contrary with regard to some species of grouper.  The limitation and closure as to other grouper species goes beyond the request made by the Gulf Council to promulgate an interim measure to bring the catch levels of red grouper into line with the Secretarial Amendment 1 requirements.  Even when there is a temporary closure of the commercial fishery because the red grouper limits have been reached, fishing is not banned for all grouper species.  Fisheries of the Caribbean, Gulf of Mexico, and South Atlantic; Reef Fish Fisheries of the Gulf of Mexico; Closure of the 2005 Shallow-Water Grouper Commercial Fishery, 70 Fed. Reg. 57,802-01 (Oct. 4, 2005)(to be codified at 50 C.F.R. pt. 622).  The statute does not allow the Secretary to institute interim measures as to the other grouper species unless there has been a finding that the other grouper species are overfished.  Such a measure may be appropriate in an amendment to a fishery management plan after completion of the procedural requirements imposed by the statutes and regulations.  It cannot, however, be implemented as an interim measure without findings of overfishing as to the other grouper species.  Such findings are lacking in this case.

Defendants argue that the pertinent national standards require the Interim Rule to include a two-month closure and bag limits for the entire grouper complex.  The Court disagrees.  The Secretary

has consistently treated red grouper as a distinct stock of fish by conducting separate stock assessments of red grouper. The Secretary previously precluded any landings of two grouper species, goliath and nasa, yet the Secretary did not feel compelled by any national standard to limit or close fishing as to other grouper species in order to further these restrictions. Secretarial Amendment 1 stated that one of the benefits of the amendment was that it gave fishermen the flexibility to fish for other species of grouper. (AR 317). The Court finds that the two-month closure of the entire grouper complex and the aggregate grouper bag limit were not necessary to satisfy any of the ten national standards.

The Court concludes that, on this Administrative Record, the extension of the Interim Rule remedies beyond red grouper was arbitrary, capricious, an abuse of discretion, and not in accordance with 16 U.S.C. § 1855(c)(1). Therefore, judgment will be entered in favor of plaintiffs as to Count Two.

## C. Count Three: Best Scientific Evidence Evidence

In Count Three of the Complaints, plaintiffs seek a declaratory judgment that defendants violated the Magnuson-Stevens Act and the Administrative Procedures Act by adopting an Interim Rule which was not based upon the best scientific evidence available. Specifically, Count Two asserts that there was no scientific data to establish, support or confirm that overfishing of red grouper in the recreational fishery was occurring sufficient to trigger the interim rule provision of 16 U.S.C. § 1855(c). For

this reason, Count Three contends that the Interim rule is arbitrary, capricious, contrary to law, and an abuse of agency discretion.

It is Congressional policy to assure that the national fishery conservation and management program utilizes and is based upon the best scientific information available.   16 U.S.C. § 1801(c)(3). The Magnuson-Stevens Act also requires that "[c]onservation and management measures shall be based upon the best scientific information available."   16 U.S.C. § 1851(a)(2); see also Midwater Trawlers Coop., 393 F.3d at 1003.   "The fact that scientific information concerning a fishery is incomplete does not prevent [regulation]."   Midwater Trawlers Coop., 393 F.3d at 1003 (quoting 50 C.F.R. § 600.315(b)); see also Blue Water Fishserman's Ass'n v. Mineta, 122 F. Supp. 2d 150, 166 (D.D.C. 2000).   "By specifying that decisions be based on the best scientific information available, the Magnuson-Stevens Act recognizes that such information may not be exact or totally complete."   Midwater Trawlers Coop., 393 F.3d at 1003 (emphasis in original).

Defendants assert that "NMFS properly relied on the available [Marine Recreational Fisheries Statistics Survey ("MRFSS")] estimates of recreational red grouper catches."   (Doc. #32, p. 14). The MRFSS uses telephone surveys to estimate fishing effort in the recreational fishing industry.[9]   (AR 1476).   For shore mode and

_____

[9]The commercial red grouper fishery can be monitored on a
(continued...)

private/rental boat fishing, effort is estimated from data collected in a random survey of coastal residents. (Id.). For party/charter boat fishing, effort is estimated from a random survey of charter vessel operators. (Id.). While NMFS determined that "MRFSS 2004 red grouper catch and harvest estimates are considered sound and the best available[,]" several recreational anglers and the red grouper recreational fishing associations questioned the validity of the 2004 landing estimates and the MRFSS method itself.

Secretarial Amendment 1 demonstrates that characterizing a fishery as overfished is a matter of experience and expertise as well as "scientific evidence." Secretarial Amendment 1 stated:

> Additionally, it should be noted that the increasing stock size seen in recent years appears to be due in large part to increased recruitment [reproduction] entering the fishery. Recruitment is variable, and variation in recruitment is difficult to predict. This creates the real possibility that setting a TAC at any given level may be acceptable for one year under current standards, and unacceptable in another. The result is a stock that varies between being fished within acceptable limits one year, and being overfished in another. This is one of the benefits of moving to a strategy based on OY [optimum yield] rather than MSY [maximum sustainable yield]. Annual fluctuations in recruitment would be much less likely to result in an overfishing situation under an OY management strategy."

(AR 338). Secretarial Amendment 1 also noted that red groupers are protogynous hermaphrodites (they initially mature as females and then transition to males), and that the effect of this on the

---

[9](...continued)
real-time basis through mandatory dealer reporting procedures.

stock's susceptibility to overfishing is not well understood.  (AR 343).  Additionally, Secretarial Amendment 1 noted that the fishery was currently being influenced by the strong 1996 red grouper year-class, and would likely continue to be influenced for the next three years.  (AR 355).  Further, Secretarial Amendment 1 also specifically discussed how the selection of red grouper biological reference points and stock status determination criteria impacts whether a stock is considered overfished (AR 528-29).

Having reviewed at length the entire administrative record, especially that relating directly to the Interim Rule, the Court concludes that the best available scientific evidence was used to promulgate the Interim Rule.  Therefore, judgment will be entered in favor of defendants as to Count Three.

**D.  Count Four: Environmental Assessment**

In Count Four of the Complaints, plaintiffs seek a declaratory judgment that defendants violated the NEPA by not adequately addressing the environmental circumstances regarding overfishing of red grouper.  Specifically, Count Four asserts that the Environmental Assessment failed to fully address documented scientific concerns about whether the rate of mortality caused by recreational fisherman have truly jeopardized the capacity of the entire red grouper fishery to produce maximum sustainable yield on a continuing basis.  Because the Environmental Assessment was inadequate, Count Four contends that the Interim rule is arbitrary, capricious, contrary to law, and an abuse of agency discretion.  In

response, defendants argue that NMFS complied with the procedural requirements, and this Court's review is limited to whether the agency has taken a "hard look" at the environmental consequences of the decision.  (Doc. #32, p. 19).

The National Environmental Policy Act ("NEPA") requires agencies to "include in every recommendation or report on proposals for ... major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on--(i) the environmental impact of the proposed action." 42 U.S.C. § 4332(C).  The obligation to prepare an environmental impact statement (the "EIS"), however, is not mandatory.  Ryder Truck Lines, Inc. v. United States, 716 F.2d 1369, 1387 (11th Cir. 1983).  If a proposed action would normally require an environmental impact statement, an agency must prepare an environmental assessment to determine whether or not an environmental impact statement is necessary. 40 C.F.R. § 1501.4(a)-(c).  If, based on the environmental assessment, the agency determines that the proposed action will not significantly affect the environment, it need not prepare an EIS and instead may issue a Finding of No Significant Impact (FONSI).  40 C.F.R. § 1508.13.

"The purpose of an [Environmental Assessment] is to determine whether there is enough likelihood of significant environmental consequences to justify the time and expense of preparing an environmental impact statement."  Fund for Animals, Inc. v. Rice,

85 F.3d 535, 546 (11th Cir. 1996).  "The role of the court in reviewing the sufficiency of an agency's consideration of environmental facts is limited both by the time in which the decision was made and by the statute mandating review."  Id. (citing Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc., 435 U.S. 519, 555 (1978)).  Moreover, the Eleventh Circuit has stated that a court's "only role [under NEPA] is to ensure that the agency has taken a 'hard look' at the environmental consequences of the proposed action."  Fund for Animals, Inc., 85 F.3d at 546; see also Strycker's Bay Neighborhood Council, Inc. v. Karlen, 444 U.S. 223, 227 (1979)("[O]nce an agency has made a decision subject to National Environmental Policy Act's procedural requirements, the only role for reviewing court is to ensure that agency has considered environmental consequences and it cannot interject itself within area of discretion of executive as to choice of action to be taken.").

Having reviewed the administrative record in detail, the Court finds that there was no violation of NEPA.  Before the Interim Rule was implemented, NMFS prepared its EA, which resulted in a FONSI, meaning that NMFS concluded that no EIS was required.  When NMFS issued its FONSI, the Gulf Council had already conducted several public hearings and received many comments and opinions from members of the recreational fishing industry regarding the then proposed Interim Rule and possible effects on the environment and the industry.  In addition to the information from the hearings and

the responses from the members of the recreational fishing industry, NMFS considered the MRFSS data relating to the red grouper catch and a separate study prepared by NMFS's Social Science Research Group entitled "Economic Effects of the Red Grouper Interim Rule Policies on the Private and Charter Boat Anglers in the Gulf of Mexico" (AR 1449-67).  Thus, the Court finds that NFMS did take a hard look and did not act arbitrarily and capriciously by concluding that it had sufficient information to determine that the Interim Rule would not significantly affect the quality of the human environment and that preparation of an EIS was therefore unnecessary.  Therefore, judgment will be entered in favor of defendants as to Count IV.

Accordingly, it is now

**ORDERED**:

1.    The Federal Defendants' Motion for Summary Judgment (Doc. #31) is **GRANTED IN PART AND DENIED IN PART.**  Judgment will be entered in favor of defendants and against plaintiffs as to Counts One, Three and Four of the Complaints filed in the above-captioned cases.  The motion is denied as to Count Two.

2.    The Co-Plaintiff Motion for Judgment on the Record (Doc. #34) is **GRANTED IN PART AND DENIED IN PART.**  Judgment will be entered in favor of plaintiff Fishing Rights Alliance, Inc. and against defendants as to Count Two.  The Motion is denied as to Counts One, Three, and Four.

3.   Plaintiff Coastal Conservation Association's Motion for Summary Judgment (Doc. #33) is **GRANTED IN PART AND DENIED IN PART**. Judgment will be entered in favor of plaintiff Coastal Conservation Association and against defendants as to Count Two.  The Motion is denied as to Counts One, Three, and Four.

4.   Judgment shall enter declaring that defendants acted arbitrarily, capriciously, in an abuse of discretion, and in violation of 16 U.S.C. § 1855(c)(1) in promulgating the Interim Rule to Reduce the Recreational Harvest of Gulf of Mexico Red Grouper to the extent that the Interim Rule and implementing regulation (1) reduced the aggregate grouper bag limit from five fish per person to three fish per person, and (2) closed recreational fishing for all grouper species (other than red grouper) in the Gulf of Mexico for November and December, 2005. The Interim Rule to Reduce the Recreational Harvest of Gulf of Mexico Red Grouper is set aside to that extent.  The Interim Rule to Reduce the Recreational Harvest of Gulf of Mexico Red Grouper is valid as to its restrictions on red grouper.

5.   The Clerk shall close both the lead and member case.

**DONE AND ORDERED** at Fort Myers, Florida, this ___31st___ day of October, 2005.

_____
**JOHN E. STEELE**
United States District Judge

Copies: Counsel of record

-26-